LARRY G. ELDER, Judge.
UPON A REHEARING EN BANC
Corporate Resource Management Inc. (CRM) appeals from a decision of the Workers’ Compensation Commission awarding benefits to Lourenda A. Southers (claimant) for an injury to her neck. On appeal, CRM contends the commission erred in concluding claimant was entitled to workers’ compensation benefits coverage for a neck injury where the injury manifested itself primarily as shoulder pain, CRM accepted a “shoulder” injury as compensable, and claimant did not file a timely claim for a “neck” injury. A panel of this Court agreed, holding by a vote of two to one that Code § 65.2-601’s two-year statute of limitations left the commission without jurisdiction to award compensation for a neck injury. See Corporate Resource Management, Inc. v. Southers, 50 Va.App. 20, 646 S.E.2d 10 (2007). Pursuant to claimant’s petition for a rehearing en banc, we stayed the mandate of that decision and granted a rehearing en banc.
On rehearing en banc, we hold that under Shawley v. Shear-Ball Construction Co., 216 Va. 442, 219 S.E.2d 849 (1975), coverage for claimant’s neck injury is not barred by the statute of limitations. CRM accepted as compensable claimant’s chronic symptoms, documented throughout her medical records as consistently involving pain in both her shoulder and *121 her neck, when those chronic symptoms had been diagnosed as a shoulder injury. The subsequent determination that those symptoms emanated from an injury to claimant’s neck rather than to her shoulder does not negate CRM’s acceptance of the symptoms as a compensable injury or the commission’s entry of an award for those symptoms.[1] The commission found the timely-filed claim for a shoulder injury, made via an agreement to pay benefits form prepared by CRM’s representative, encompassed the subsequently diagnosed neck injury, and credible evidence supports that finding. Thus, we affirm the commission’s award of benefits.
I.
BACKGROUND
Because claimant prevailed before the commission, we recite the evidence in the light most favorable to her. See, e.g., Crisp v. Brown’s Tysons Corner Dodge, Inc., 1 Va.App. 503, 504, 339 S.E.2d 916, 916 (1986). So viewed, the evidence established that claimant sustained an injury by accident on May 23, 2003, when she was vacuuming and fell backward down a series of four steps while working as a housecleaner for Cottage Care, a division of CRM. She was carrying a “portavac” around her neck, and when she fell, she landed with all her weight on her left shoulder. She sought medical treatment, complaining of pain throughout her entire left shoulder and across the back of the shoulder blade that “moves to [the] left side of [her] neck.” She came under the care of an orthopedist, Dr. Praveer Srivastava, who ordered various tests, including a left shoulder MRI, and a course of physical therapy but was unable to determine the source of claimant’s shoulder and neck pain. When a course of work *122 hardening resulted in some improvement, Dr. Srivastava released claimant to return to work without restrictions, but within a few weeks, she reported a recurrence of “severe[ ] symptom[s]” in her shoulder and neck and was again excused from work.
During that time frame, CRM and its purported insurance carrier were engaged in a dispute over whether CRM in fact had coverage at the time of claimant’s accident. While that dispute was ongoing, the carrier requested an independent medical examination with Dr. Howard G. Stern. After examining claimant on September 26, 2003, Dr. Stern noted “signs and symptoms of a left cervical radiculopathy” and recommended an MRI of claimant’s cervical spine.
Dr. Wilhelm A. Zuelzer saw claimant in October 2003 to render a second opinion at claimant’s request. Dr. Zuelzer, like Dr. Srivastava, noted claimant’s ongoing neck and left shoulder pain, but Dr. Zuelzer opined claimant’s shoulder was “fine” and was not the source of her symptoms. Dr. Zuelzer, like Dr. Stern, recommended an MRI of the neck, but Dr. Zuelzer indicated he thought that, regardless of what the MRI showed, claimant’s ongoing pain “more than likely is coming from [the neck] area.” He also recommended “medication to help [claimant] sleep, mobilization modalities and possibly a very localized trigger point injection.”
After receiving Dr. Zuelzer’s recommendations, Dr. Srivastava ordered additional tests including an MRI of claimant’s cervical spine. The MRI revealed only a “[minimal C5-6 posterior disc bulge” and was “otherwise normal.” When claimant returned to Dr. Srivastava on November 20, 2003, with “unchanged symptoms” including persistent neck and left shoulder pain, Dr. Srivastava informed her that her various tests revealed no significant abnormalities, and he released her to regular duty. Dr. Stern, who independently reviewed the results of claimant’s cervical MRI in the first part of 2004, agreed with Dr. Srivastava that the MRI excluded cervical radiculopathy and, thus, that claimant was capable of returning to full duty employment.
*123 Although Dr. Zuelzer had suggested “mobilization modalities” or “a very localized trigger point injection,” the record contains no indication that Dr. Srivastava offered claimant either of these treatments. Thereafter, claimant experienced “[ongoing] neck and shoulder pain,” but Dr. Srivastava refused to treat her because “the bills were not paid at that time.” Claimant had no private health insurance and also had insufficient funds to obtain her own medical treatment because she was unable to work due to her injury during that time. Thus, although claimant experienced ongoing pain, CRM’s dispute with the purported carrier and Dr. Srivastava’s refusal to treat claimant without advance payment prevented her from receiving medical treatment for her chronic symptoms from late 2003 until mid-2005.
In late 2003, claimant sought additional temporary total disability benefits, but the dispute between CRM and the carrier delayed resolution of this claim as well. In March 2005, CRM accepted liability for the additional period of temporary total disability. An award for disability and lifetime medical benefits for the shoulder injury was entered on May 2, 2005, and at claimant’s request, CRM offered her a new panel of physicians on May 11, 2005. Claimant chose a new treating physician from the list but was not able to obtain an appointment with him until June 8, 2005, two years and approximately two weeks after her accident of May 23, 2003.
When claimant saw her new treating physician, Dr. John Frederick Meyers, on June 8, 2005, she reported chronic pain in her left upper back and shoulder, and Dr. Meyers noted tenderness and limited rotation in claimant’s neck. He diagnosed her as having cervical radiculitis. After a spine surgeon determined claimant was not a candidate for surgery, she was referred to a pain management physician, Dr. Michael DePalma.
Dr. DePalma performed a series of diagnostic injections and opined that claimant had facet joint arthrosis of the cervical spine at C5-6. Dr. DePalma indicated that “[t]he primary source of [claimant’s] pain was the [facet] joint” and explained *124 that this was a different diagnosis categorically from cervical radiculopathy, which is a dysfunction of the nerve root at the vertebral joint rather than at the facet joint. He also noted that “[fjacet joint arthrosis is ... difficult to completely discern just on MRI findings.” Finally, he opined to a reasonable degree of medical probability that claimant’s work-related fall caused the injury to her cervical spine, which was the source of her symptoms and work restrictions.
When claimant filed a new change-in-condition application, CRM contended the claim for a neck injury was barred by the statute of limitations because her original claim was for an injury to her left shoulder only.[2] At the hearing before the deputy, claimant testified that the primary pain she experienced was consistently in the same part of her body, which she described as her entire back left shoulder with radiation into her left arm and hand. She testified that Dr. Meyers, whom she first saw over two years after the accident, was the first physician to tell her that her “injury was coming from [her] neck.” She denied having “any other accidents of any kind whatsoever since [her] original accident back in 2003.” She agreed that she signed the agreement to pay benefits form on September 18, 2003, listing her injury as a “contusion to [her] left shoulder” and that she had an attorney when she did so, but she indicated she did not complete the form herself.
The deputy concluded that claimant’s claim was not barred by the statute of limitations, reasoning as follows:
[T]he Agreement to Pay Benefits form reflects a contusion to the left shoulder. Medical records reflect some neck *125 pain____ Despite conflicting opinions about the etiology of the claimant’s symptoms, it is clear that they have their origin in the occupational accident and have manifested themselves primarily as shoulder symptoms. The claimant could not reasonably be expected to file a claim for a neck injury when none had been diagnosed, and we do not believe her claim is time-barred because a new physician now disagrees with the earlier diagnosis as to the etiology of her symptoms.
The deputy further noted that the claim did not involve a situation in which claimant sustained multiple injuries to different parts of the body and filed a timely claim for injury to only one of those body parts.
CRM filed a request for review, and the commission affirmed, with one commissioner dissenting. The majority reasoned as follows:
The Agreement to Pay Benefits form indicated the nature of injury to be a contusion to the left shoulder. The claimant has consistently complained of pain in the lateral section of her shoulder, which at times included neck pain and radiation both down the arm and up the neck. It is uncontradicted that her symptoms never changed from the date of the accident. While the claimant complained of neck and shoulder complaints, she received various diagnoses relating only to the shoulder and it was not until she underwent substantial diagnostic evaluations that Drs. Meyers and DePalma diagnosed her with a neck injury.
Therefore, we find that this is not a case involving injuries to two separate body parts but the same injury throughout the course of treatment, now presenting with an altered diagnosis. We find that the constant symptoms caused by the injury encompassed both the shoulder and neck and neither the nature of the injury nor the manifestation of the symptoms have changed since the date of injury or when the Agreement to Pay Benefits form was executed. The claimant’s symptoms have consistently manifested in shoulder pain which [only] recently [has been] attributed to claimant’s neck injury. We agree with the Deputy Commis *126 sioner that it was reasonable for the claimant to have relied on the treating physician’s diagnoses in seeking benefits relating to the shoulder contusion and it would be unreasonable to expect a claimant to file a claim for an injury to a body part, for the same symptoms for which the claimed diagnosis was made, for which her physician had not identified any specific injury.
(Emphasis added). The commission noted that CRM had notice of the accident and injury and that the Workers’ Compensation Act does not “impose a duty on employees to amend agreement forms with each new development in treatment.” It distinguished the holding in Shawley as involving the untimely filing of a claim for a body part wholly unrelated to the body part named in the initial claim for benefits.
CRM noted this appeal.
II.
ANALYSIS
On appeal, we are guided by the principle that the Workers’ Compensation Act “is highly remedial.” Henderson v. Cent. Tel. Co., 233 Va. 377, 382, 355 S.E.2d 596, 599 (1987). Although “statutory construction may not be used to extend the rights created by the Act beyond the limitations and purposes set out therein,” Garcia v. Mantech Int’l Corp., 2 Va.App. 749, 754, 347 S.E.2d 548, 551 (1986), the Act should nevertheless “be liberally construed to advance its purpose ... [of compensating employees] for accidental injuries resulting from the hazards of the employment,” Henderson, 233 Va. at 382, 355 S.E.2d at 599. “Although ‘we are not bound by the commission’s legal analysis in this or prior cases,’ we give great weight to the commission’s construction of the Act, and we defer to the commission’s factual findings if supported by credible evidence in the record.” Bay Concrete Constr. Co. v. Davis, 43 Va.App. 528, 538-39, 600 S.E.2d 144, 150 (2004) (quoting USAir, Inc. v. Joyce, 27 Va.App. 184, 189 n. 1, 497 S.E.2d 904, 906 n. 1 (1998)) (citations omitted).
*127 “ ‘The right to compensation under the [workers’] compensation law is granted by statute, and in giving the right the legislature has full power to proscribe the time and manner of its exercise.’ ” Binswanger Glass Co. v. Wallace, 214 Va. 70, 73, 197 S.E.2d 191, 193 (1973) (quoting Winston v. City of Richmond, 196 Va. 403, 407, 83 S.E.2d 728, 731 (1954)). Via Code § 65.2-601, the legislature has provided that “[t]he right to compensation under [the Workers’ Compensation Act] shall be forever barred[ ] unless a claim be filed with the Commission within two years after the accident.” The statute of limitations in Code § 65.2-601 is jurisdictional. Barksdale v. H.O. Engen, Inc., 218 Va. 496, 497, 237 S.E.2d 794, 795 (1977). Statutes of limitations “are designed to suppress fraudulent and stale claims from being asserted after a great lapse of time, to the surprise of the parties, when the evidence may have been lost, the facts may have become obscure because of a defective memory, or the witnesses have died or disappeared.” Street v. Consumers Mining Corp., 185 Va. 561, 575, 39 S.E.2d 271, 277 (1946). Whether the information filed with the commission is sufficient to constitute a timely filed claim for a particular injury is a question of fact, and the commission’s finding will not be disturbed on appeal if supported by credible evidence. See, e.g., Fairfax County Sch. Bd. v. Humphrey, 41 Va.App. 147, 158, 583 S.E.2d 65, 70 (2003).
The Supreme Court applied the Act’s statute of limitations in the seminal case of Shawley,[3] upholding the commission’s finding that a timely claim for injuries to an employee’s left ankle and right hip did not preserve a claim for injuries to his back and right ankle where the medical records gave no indication of any injuries to the back and right ankle until after the statute of limitations had passed. 216 Va. at 443-47, 219 S.E.2d at 851-53. The Supreme Court noted the commission’s factual findings that “the back and right ankle claims asserted by [Shawley] were for injuries not covered by the *128 memorandum of agreement or [the commission’s] original award” and that Shawley made “ ‘no assertion or complaint of back or right leg injury' ” until after the applicable statute of limitations had expired. Id. at 444, 445, 219 S.E.2d at 851, 852 (emphasis added).
CRM, relying on Shawley, argues that a timely claim was filed only for claimant’s shoulder injury and that, because it is undisputed claimant’s current disability stems from an injury to her cervical spine rather than her shoulder, the statute of limitations bars her from receiving benefits for the cervical spine injury. We hold Shawley is distinguishable and does not support application of the statute of limitations to bar benefits for the only chronic injury claimant sustained. In Shawley, the commission found the record contained no timely complaints concerning Shawley’s back and right ankle and that the claimed injuries to these body parts were not covered by the memorandum of agreement.[4] The Court listed what it referred to as “compelling” reasons for requiring a claimant to file a timely claim for all injuries sustained in a particular accident—the need of the employer to “determin[e] whether or not there was in fact an injury, the nature and extent thereof, and if related to the accident.” Id. at 446, 219 S.E.2d at 853. The Court also noted that the filing of a timely claim allows an employer to obtain “the treatment necessary to effect a cure of the claimant and to minimize the employer’s liability.” Id. at 447, 219 S.E.2d at 853. Because Shawley reported only an injury to his left ankle and right hip, the employer had no notice that Shawley contended his back and right ankle were involved; no opportunity to make a contemporaneous determination about whether the back and right ankle injuries could, in fact, have been sustained in the accident reported; and no ability to obtain timely medical treatment for those body parts not originally listed in order to minimize its liability for disability and medical treatment resulting from injury to those parts. In addition to noting *129 Shawley did not file a timely claim for injury to those body parts, the Supreme Court emphasized that “[a]n examination of the medical reports and other documents submitted within the [statute of limitations] period from the date of the accident fail[ed] to disclose any reference to an injury to Shawley’s back or to his right leg or right ankle” and that “[n]owhere in any of the reports [was] it recorded that Shawley complained of such an injury within that period.” Id. at 444-47, 219 S.E.2d at 851-53. Thus, the Court found relevant both the failure to file a formal claim listing injuries to the back and right ankle prior to expiration of the statute of limitations and the absence of any mention of injury to those body parts in the medical records prior to expiration of the statute of limitations.
Claimant’s situation is readily distinguishable.[5] In claimant’s case, claimant reported falling on her left shoulder, and CRM accepted as compensable the injury to claimant’s left shoulder. In marked contrast to Shawley, the commission found that, contemporaneously with the accident and prior to expiration of the statute of limitations, claimant “consistently complained of pain in the lateral section of her [left] shoulder, which at times included neck pain and radiation ... up the neck.” (Emphasis added). The commission’s finding that claimant’s cervical spine injury was encompassed by the award for her shoulder injury was supported by credible evidence in the record.[6] As the commission stated,
*130 it was reasonable for the claimant to have relied on the treating physician’s diagnoses in seeking benefits relating to the shoulder contusion and it would be unreasonable to expect a claimant to file a claim for an injury to a body part [the neck], for the same symptoms for which the claimed diagnosis was made, for which her treating physician had not identified any specific injury.
Application of such reasoning under the facts of this case does not contravene Shawley’s holding regarding the “compelling” reasons entitling an employer to timely notice of a particular injury. Here, unlike in Shawley, claimant’s timely claim for a left shoulder injury and her consistent complaints to her medical providers of pain in her left shoulder radiating into her neck gave CRM all the notice it needed to meet the objectives that Shawley termed “compelling” reasons requiring the timely filing of a claim for all injured body parts. CRM had timely notice of claimant’s assertion that she suffered a significant blow to her left shoulder area, and claimant *131 received timely medical attention for the affected, interrelated body parts and symptoms. Claimant, a layperson with a ninth grade education, could not be expected to know precisely where her scapular region ended and her cervical region began.
Further, neither claimant’s original treating physician nor the physician who performed an independent medical examination at CRM’s request was successful in determining the precise source of claimant’s radiating shoulder pain before the statute of limitations had expired. In fact, both these physicians purported to exclude claimant’s cervical region as the source of her chronic pain. The physician from whom claimant obtained a second opinion, Dr. Zuelzer, noted in his records that claimant’s problems most likely were emanating from her neck regardless of what a cervical MRI revealed, and he recommended “mobilization modalities and possibly a very localized trigger point injection.” However, after claimant’s cervical MRI revealed no abnormalities, Dr. Srivastava did not offer those treatments to claimant, and claimant went without medical attention for eighteen months while CRM attempted to determine whether it had workers’ compensation coverage for claimant’s accident.
When the “primary source” of claimant’s chronic pain was finally diagnosed as “facet joint arthrosis” of the cervical spine at C5-6, CRM had the opportunity to contest causation and was not held to its prior acceptance of claimant’s injury to her “shoulder” as binding it to cover the newly diagnosed source of claimant’s pain. CRM does not contest the commission’s determination of causation in this appeal and does not contend that it might somehow have proved the injury to claimant’s cervical spine was unrelated to the industrial accident if it had received notice of the precise mechanism of claimant’s injury within the statutory period. Claimant should not be penalized because her physicians were not initially successful in identifying the source of her symptoms, particularly in light of the lengthy break in her medical treatment caused by CRM’s dispute with its putative insurance carrier.
*132 Finally, although claimant was represented by counsel, it was CRM’s representative, not claimant or claimant’s counsel, who prepared the agreement to pay benefits form upon which the award of benefits was based. That form listed the injury as a shoulder “contusion” despite the fact that the medical records in the possession of CRM’s representative made clear, prior to the time the agreement to pay benefits was filed with the commission, that claimant had suffered more than a mere “contusion.” CRM conceded at oral argument on rehearing en banc that the description of injury in the agreement to pay benefits form did not limit claimant to treatment for a “contusion” to the shoulder and was broad enough to cover all of claimant’s chronic neck and shoulder symptoms if those symptoms were actually caused by an injury to the left shoulder more severe than a mere “contusion.” We agree on these facts that barring benefits for injuries to the shoulder beyond a mere contusion would open the door wide to undesirable consequences that do not further the purpose of the Act and are not compelled by Code § 65.2-601 or Shawley. Such a holding would create an enormous pitfall for the unwary claimant, who has no obvious reason or incentive not to accept the benefits to which he or she will be entitled under an agreement to pay benefits in which the employer or insurance carrier has chosen to list only one of several compensable injuries that the employee may have received or to describe the injury as being to the most precise or narrowly restricted body part.
Despite this concession, however, CRM contends it is not responsible for claimant’s chronic shoulder and neck symptoms now that it has been determined that they are caused by an injury to claimant’s neck rather that her shoulder. We reject this reasoning. If the listing of shoulder “contusion” is broad enough to include all injuries to the shoulder sustained at the same time as the contusion, as well as all symptoms caused by those other injuries in adjacent body parts, which employer agrees that it is, we see no principled basis for distinguishing the case in which, unbeknownst to the claimant and the employer, those same exact symptoms actually ema *133 nate from a simultaneously incurred injury to the neck rather than the shoulder and the precise etiology of the symptoms is determined only after the statute of limitations has expired. The fact that CRM did not learn at an earlier time the precise mechanism causing claimant’s chronic pain was not the fault of claimant, was partially the fault of CRM due to its lapse in providing her with medical treatment, and did not prejudice the employer. Applying the statute of limitations on these facts—where employer accepted claimant’s symptoms as a compensable shoulder injury, claimant’s symptoms remained constant, and the only thing that changed was the diagnosis concerning the source of those symptoms—would provide a windfall to CRM and impose upon claimant a forfeiture not required by either the statute or controlling case law interpreting it.
Thus, on these facts, we hold credible evidence in the record supports the commission’s conclusion that its entry of an award for medical and disability benefits for claimant’s “shoulder injury” of May 23, 2003, covered the cervical spine facet joint arthrosis injury that manifested itself in claimant’s chronic shoulder and neck pain.
III.
For these reasons, we hold the commission did not err in concluding the statute of limitations did not prevent claimant from receiving benefits for the injury to her neck. Thus, we affirm the commission’s award of benefits.

Affirmed.

. Due in large part to a dispute between CRM and its purported insurance carrier, which resulted in a delay in claimant’s receipt of medical treatment, claimant received a diagnosis of neck injury as the source of her chronic neck and shoulder symptoms only after the applicable statute of limitations had run. Employer remained free to challenge causation based on the new diagnosis, and employer in fact did so before the commission in this case.

. Claimant "relie[d] on estoppel or imposition, given the complicated procedural history” of the claim. As the deputy explained claimant’s argument, due to the dispute between CRM and its purported carrier, "the prior claim was not resolved until May 2005. A new panel [of physicians] was then awarded. By the time the claimant saw the new doctor [who she testified was the first to diagnose her injury as being to her neck], it was more than two years beyond the date of accident.” Claimant raised the doctrine of imposition before both the deputy and the commission, but the commission chose to make no ruling on the application of the doctrine because it found the statute of limitations did not bar the claim.

. Shawley was decided under Code § 65.1-87, the predecessor to present Code § 65.2-601, which provided a one-year statute of limitations.

. The commission has replaced its former memorandum of agreement form with the agreement to pay benefits form.

. The decision in Tuck v. Goodyear Tire & Rubber Co., 47 Va.App. 276, 623 S.E.2d 433 (2005), cited by the dissent, also is distinguishable from claimant’s situation. The outcome in Tuck was based in large part on the unique procedural history and facts as found by the commission in that case and, thus, is not at odds with our holding here.

. Claimant testified that she did not report neck pain to her medical providers, although frequent notations about reports of neck pain appear in her medical records. The deputy considered this testimony in his opinion but implicitly concluded it did not compel the finding that claimant made no such reports. The commission also found as a fact that claimant "consistently complained of pain in the lateral section of her shoulder, which at times included neck pain and radiation both down the arm and up the neck.”
*130 Credible evidence in the record supports these findings. Further, these findings do not run afoul of the ruling announced in Massie v. Firmstone, 134 Va. 450, 462, 114 S.E. 652, 656 (1922), which provides that, although a party offering witnesses giving conflicting testimony may ask the court to accept the more favorable testimony, that principle is not applicable "to the testimony which [the litigant] gives himself” because "[n]o litigant can successfully ask a court or jury to believe that he has not told the truth.” The holding in Massie applies to "statement[s] of fact within [the litigant’s] knowledge” but not to “expression[s] of opinion.” Ford Motor Co. v. Bartholomew, 224 Va. 421, 431, 297 S.E.2d 675, 680 (1982).
On this record, the evidence supported a finding that claimant's testimony that she did not report neck pain to her medical providers was not a "statement of fact within [her] knowledge” in the sense that she was a layperson with a ninth grade education and no medical training. The commission was entitled to conclude that this seeming discrepancy between claimant’s testimony and her medical records resulted from the fact that claimant could merely have shown the various treating medical personnel where she hurt, after which they determined the appropriate name for the part of the body part or parts to which she referred. Clearly, the primary location of claimant's pain was her left shoulder, and as set out infra in the text, claimant, a layperson with a ninth grade education, could not be expected to know with anatomic precision where her scapular region ended and her cervical region began.